Filed 6/16/14  P. v. Alquicira CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>IVAN ALQUICIRA,<br><br>        Defendant and Appellant. | B247115<br><br>(Los Angeles County<br>Super. Ct. No. BA395545) |

        APPEAL from a judgment of the Superior Court of Los Angeles County.  Stephen A. Marcus, Judge.  Affirmed with modifications.

        David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.


* * * * * *

Ivan Alquicira appeals from the judgment entered upon his conviction by jury of three counts of assault with a firearm (Pen. Code, § 245, subd. (a)(2), counts 1, 2, and 3),[1] and two counts of making criminal threats (§ 422, counts 4 and 5). As to all counts, the jury also found true the special allegations that appellant personally used a firearm (§ 12022.5, subd. (a)), the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(B)), and that appellant committed the offenses as hate crimes (§ 422.75, subd. (a)). The trial court sentenced appellant to a prison term of 25 years and four months.

Appellant contends (1) there was insufficient evidence to support his convictions for assault and making criminal threats, (2) the prosecutor misstated the law during closing argument, (3) the trial court erred in failing to give required instructions regarding legal causation, (4) he was improperly impeached with a prior conviction, (5) the cumulative effect of the trial court's errors requires reversal, and (6) the trial court made various sentencing errors. We hold that the trial court erred in failing to stay the sentences for the criminal threat convictions (counts 4 and 5) pursuant to section 654 and will modify the judgment accordingly. The judgment is otherwise affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

**Prosecution Case**

On March 26, 2012, at approximately 5:00 p.m., Shanika Jordan, George Leonard, and Jordan's seven-year-old son, D., were walking on Estara Avenue near Drew Street in the City of Los Angeles. As they walked past an apartment building on Estara Avenue, they heard appellant and another man call them "niggers" and state "you niggers need to get out of our neighborhood." Appellant was standing on a first-floor balcony close to the street. Leonard looked up at appellant and stated "What? What's up?" Appellant responded "This is my neighborhood, this is the Avenues,[2] this is the Avenues, this is my

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     The "Avenues" was the largest criminal street gang that operated in Northeast Los Angeles.

neighborhood, you niggers need to get out of my neighborhood." Appellant ran inside his apartment and returned with a shotgun which he pointed at Leonard, Jordan, and D. Appellant, armed with the shotgun, left the balcony and began running down the stairs yelling, "This is the Avenues" and "You ain't gonna get out of my hood." Leonard feared for his life because appellant was running towards him and he believed appellant was going to use the shotgun. Jordan was terrified and she and her son ran in one direction, Leonard ran in another. Appellant chased Leonard. Jordan returned to her home and called 911.

Los Angeles Police Department (LAPD) Officer Robert Chellew responded to a radio call regarding the assault and went to appellant's apartment. Appellant's relatives answered the door and told Officer Chellew that appellant was inside. Officer Chellew heard footsteps running back and forth in the upstairs bedroom of the apartment. Appellant refused at least 10 commands to exit the apartment and a SWAT (special weapons and tactics) team was called. Appellant came out of the apartment when the SWAT team arrived at the location. Appellant consented to a search of his apartment. Officer Chellew found a .22-caliber pellet rifle in the corner of the bedroom. A sawed-off pistol-grip 12-gauge shotgun and a 16-gauge round were found in the attic area. A 16-gauge round was laying next to it. Officer Chellew discovered there was no shell in the actual chamber of the shotgun but there was a 16-gauge shell in the magazine. He was able to determine the shotgun was operable.[3] Inside a toilet in the apartment, he found a sock containing .357 handgun rounds and one 12-gauge shotgun round. The walls and furniture of appellant's bedroom were covered in Avenues gang graffiti.

LAPD Detective Anthony Stephenson interviewed appellant at the police station. Appellant stated that he was standing on his balcony overlooking Estara Avenue when an African-American male, female, and child walked by on the side of the street by his building. The African-American male "mad-dogged" him and words were exchanged.

---

[3] At trial, Jordan and Leonard identified this shotgun as the one appellant pointed at them.

Appellant stated he had a BB rifle with him but did not point it at anybody. Appellant then revised his account to state that the African-American male returned after the initial encounter and it appeared to appellant that he was armed. Words were exchanged again and appellant stated he may have used a racial slur to try to intimidate him. Appellant maintained that the BB gun was the only weapon inside his house. Detective Stephenson told appellant that a shotgun, bullets, and shotgun shells were found in the apartment. Appellant put his head down, dropped his shoulders and seemed "deflated." Appellant then admitted he pointed a shotgun at Leonard, Jordan, and D., and also admitted the ammunition in the toilet belonged to him. Appellant stated he got the shotgun after his "homie" died and he was trying to "run them (Leonard, Jordan, and D.) out of the neighborhood." Jordan moved out of her house the day after appellant threatened her and never returned to the neighborhood. Leonard never returned to the neighborhood because he "felt like [he] wasn't safe anymore because of the color of [his] skin" and "the words" appellant said to him.

LAPD Officer Joseph Bain testified about the Avenues gang, appellant's membership in the Avenues gang, and criminal street gangs in general. There were approximately 680 documented active members of the Avenues and Officer Bain had personally been in contact with approximately 250 of them through his work in the gang unit. The primary criminal activities of the Avenues included trafficking and sales of weapons and narcotics, battery, battery on police officers, assault, carjacking, robbery, burglary, kidnapping, witness intimidation, extortion, attempted murder, attempted murder of police officers, and murder for hate against African-Americans. Like other street gangs, the Avenues street gang protected its territory from rival gangs but the Avenues also adopted a policy of ethnic cleansing in territories they controlled. The gang's common signs and symbols included a skull and fedora, and the following words and letters: An apostrophe "S" which is short for Avenues, "A-V-E-S" which is also short for Avenues, and anything with "LA" on it including LA Dodger attire. The Avenues gang was "by far" the largest gang in the northeast area of Los Angeles and "Drew Street" was one of the four geographical cliques within the Avenues. Officer Bain

4

testified that the main hang out for the Drew Street clique was the area of Estara Avenue and Drew Street. The area contained Avenues graffiti which used racial slurs and advocated violence against African-Americans.

Officer Bain was familiar with appellant and had approximately 10 to 15 recent contacts with him. He opined appellant belonged to the Avenues Drew Street clique based on appellant's admission that he was a member, his association with other Avenues gang members, and his tattoos.[4] Responding to a hypothetical question based on the facts of the assaults and threats on Estara Avenue, Officer Bain opined that the crimes were committed for the benefit of the Avenues criminal street gang because the crimes instilled fear and intimidation in the community and specifically promoted the gang's stated policy of ethnic cleansing by driving an African-American family out of the neighborhood.

**Defense Case**

Appellant testified on his own behalf. He saw Leonard, Jordan, and D. walk by his apartment. Leonard and he started "mad-dogging" each other and there was tension between them. Approximately 10 minutes later, Leonard came back with Jordan. Leonard looked very angry and reached under his waistband as if he was going to take out something. Leonard stated, "What's up, homie? You got a problem with me?" Appellant felt his life was being threatened. He was intimidated by how "big" Leonard was and reached for his shotgun which was next to him. Appellant "showed" the shotgun to Leonard and stated, "get the fuck out of my apartment." Appellant testified, "And it worked because it made him leave." Appellant denied using any racial slurs or telling anybody to get out of his neighborhood. He also denied leaving his balcony and chasing Leonard. Appellant admitted he was a documented Avenues gang member but denied involvement in the gang. He refused to leave his apartment when the police requested him to do so because he was afraid the police were going to shoot him "at first sight." He "panicked" and hid the shotgun in the attic and "threw [the sock] in the toilet."

---

[4] Appellant had the word "A-V-E-S" tattooed on his stomach.

5

David Lopez and his niece were on the balcony next to appellant on the day of the incident. Lopez saw Jordan and Leonard on the sidewalk. Leonard and appellant exchanged words and both of them were angry. Jordan and Leonard left and Lopez took his niece upstairs to his apartment. A few minutes later, Jordan and Leonard returned. Lopez saw Leonard remove his sweater or shirt and grab his waist. Lopez and his niece went inside.

Bruce Krell was a licensed firearms dealer and gunsmith and an experienced firearms instructor. He described the components of a "shot shell". He testified that the gauge of a "shot shell" is determined by the number of pellets in a pound and the size of each pellet–the larger the gauge, the larger the number of pellets. Krell did not examine the shotgun or the shells in this case. He opined that it would be dangerous to put a 16-gauge shell in a 12-gauge shotgun.

**Procedural Background**

The trial court selected count 1, assault with a firearm, as the principal count and imposed the upper term of four years. The trial court then imposed the midterm of four years on the firearm enhancement, the upper term of three years on the hate crime enhancement, and the mandatory five years for the gang enhancement, for a total of 16 years. As to counts 2 and 3, the trial court imposed consecutive sentences of four years and eight months for each count (comprised of one-third the midterms for the offenses and enhancements). The trial court imposed concurrent sentences for counts 4 and 5, of 15 years each, comprised of the upper term of three years for the criminal threats, the midterm of four years on the firearm enhancement, the upper term of three years on the hate crime enhancement, and the mandatory five years for the gang enhancement.

**DISCUSSSION**

I.      **Substantial Evidence Supported Appellant's Convictions for Assault**

      *A.      Contention*

Appellant contends the trial court improperly denied his section 1118.1 motion as to the assault counts and his convictions were not supported by substantial evidence. Specifically, appellant contends the prosecution presented no evidence that "the 12-gauge

6

shotgun appellant pointed at the victims was capable of firing 16-gauge shells," the prosecution failed to rebut the defense expert's testimony "that the gun could not fire [16-gauge] shells," and the present ability element was not satisfied because there was no "proof beyond a reasonable doubt that the [shot]gun contained 12-gauge shells when appellant pointed it" at the victims.

## B. Standard of Review

"We utilize the substantial evidence test to determine whether the prosecution has introduced sufficient evidence to meet its burden of proof beyond a reasonable doubt. (*People v. Augborne* (2002) 104 Cal.App.4th 362, 371.) This standard "'applies both when an appellate court is reviewing on appeal the sufficiency of the evidence to support a conviction and when a trial court is deciding the same issue in the context of a motion for acquittal under Penal Code section 1118.1 at the close of evidence.' [Citations.]" (*Ibid.*) In applying the substantial evidence standard "we must determine only whether, on the record as a whole, any rational trier of fact could find him guilty beyond a reasonable doubt. [Citation.] We view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1028.) Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.) Thus, unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict" the conviction will not be reversed. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)

## C. Relevant Authority

An assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) A conviction for assault with a deadly weapon requires proof of an attempt to inflict violent injury and the present ability to do so. (*People v. Wolcott* (1983) 34 Cal.3d 92, 102.) Pointing an unloaded or inoperable gun at another person without any effort or threat to use it as a bludgeon does not

7

constitute an assault with a deadly weapon. (*People v. Sheldon* (1989) 48 Cal.3d 935, 961-962.) The question whether or not the firearm was loaded is a question of fact to be determined by the jury. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 12-14.)

California courts have held attempting to shoot someone with an unloaded gun does not constitute the crime of assault because the perpetrator lacks the "present ability" to inflict injury. (*People v. Sylva* (1904) 143 Cal. 62, 64; *People v. Mosqueda* (1970) 5 Cal.App.3d 540.) Nor, does threatening someone with a toy gun or candy pistol satisfy this element. (*People v. Vaiza* (1966) 244 Cal.App.2d 121.) On the other hand, a defendant has been held to have a present ability to injure where he is only a moment away from being able to fire his gun. (*People v. Simpson* (1933) 134 Cal.App. 646, 650 [gun's magazine was loaded but no bullet in firing chamber]; *People v. Ranson* (1974) 40 Cal.App.3d 317, 321 [gun jammed when defendant tried to fire first round but he possessed knowledge and ability to quickly cure the jam, even though he had not done so at time attempt ended].

### D.     Analysis

Appellant does not dispute that the shotgun was operable and capable of firing. Officer Chellew testified that in rendering the shotgun safe he verified it was operable. He did so by "racking the action" and verifying that there was a firing pin at the bottom of the chamber. Officer Chellew did not fire the shotgun or test it to see if it was capable of firing 16-gauge shells. Appellant directs us to the 16-gauge shell found in the magazine of the shotgun, the other 16-gauge shell found beside the gun in the attic, and the defense expert's opinion that in general, 12-gauge shotguns could not fire 16-gauge shells.[5] Appellant focuses his argument on these specific facts and argues at one point that the prosecution had to prove that the shotgun could fire 16-gauge shells. This contention misstates the prosecution's burden. Appellant also dismisses as speculation a set of circumstances supporting a finding that the gun at some point was loaded with the

---

[5]     Defense expert conducted his tests using a Remington 870 pump shotgun and not the shotgun used by appellant. He testified that "most pump shotguns operate pretty much the same with the same mechanics."

8

12-gauge shell found in appellant's apartment. He does not consider the evidence, as we must, as a whole and he does not consider the entire course of the offense.

In determining whether a gun was loaded, the jury may infer "an implied assertion that the gun was loaded" from the defendant's acts and language. (*People v. Hall* (1927) 87 Cal.App. 634, 636 (*Hall*).) In *People v. Montgomery* (1911) 15 Cal.App .315, 316-317 (*Montgomery*), the court upheld the defendant's conviction for assault with a firearm because the defendant's acts and language supplied substantial evidence from which the jury could reasonably infer that the gun was loaded. In *Montgomery*, the victim and the defendant were working in a stable when they became involved in an altercation. (*Id.* at p. 317.) The defendant ran back to his home, returned with a gun, pointed the gun at the victim, and said, ""'I have got you now . . . .'"" (*Ibid.*) When the victim yelled for help and telephoned the stable owner, the defendant hid near the stable with his gun. (*Id.* at pp. 317-318.) The stable owner managed to lead the defendant away. (*Id.* at p. 318.) Police found the defendant in his home later that night and retrieved his unloaded gun a few days later. (*Ibid.*) Despite the fact that the gun was found unloaded, the court concluded "all these facts and circumstances had a tendency to prove that the gun was loaded . . . ." (*Ibid.*) The court specifically noted the importance of several factors. First, the defendant had been angry with the victim both when he left the stable and when he returned with the gun. (*Ibid.*) Second, the defendant took the time to leave the stable, travel home, and retrieve the gun. (*Ibid.*) Third, the defendant's statement, "'I have got you now,'" would be meaningless if the gun had not been loaded. (*Id.* at pp. 318-319.)

The facts of *Montgomery* bear some obvious similarities to the facts alleged here. Like the defendant in *Montgomery*, appellant here was incredibly angry with his victims. Appellant was an admitted member of the largest criminal street gang in the northeast area of Los Angeles that had a policy of perpetrating violence against African-Americans. The incident took place in a neighborhood which was described as a stronghold for the gang and featured graffiti that contained racial slurs and advocated violence against African-Americans. Appellant observed Leonard, an African-American male accompanied by Jordan and her young son D., also African-American, on the

9

sidewalk outside his apartment. As in *Montgomery* an altercation occurred. Appellant and Leonard "mad-dogged" each other and exchanged angry words. Appellant said that he was scared for his life because Leonard was "big" and intimidated him. Also, like the defendant in *Montgomery*, appellant left the immediate scene of the dispute and returned with a weapon. Appellant pointed his shotgun at Leonard and repeatedly told him to get out of the neighborhood. Appellant's act of pointing the gun at Leonard and ordering him to leave the neighborhood reasonably leads to an inference that the gun was loaded. Appellant told Leonard to "get the fuck out of [his] apartment" and because this was Avenues' territory, Leonard needed to get out of appellant's neighborhood. Appellant got more upset when it appeared that Leonard was not complying with appellant's order. Just as it would have been meaningless for the defendant in *Montgomery* to say that he "got" the victim if his gun was unloaded, appellant running down the stairs yelling racial slurs and chasing an individual who scared and intimidated appellant is inexplicable if appellant was brandishing an unloaded shotgun. Appellant behaved as if the gun was loaded and operable and implicitly threatened he intended to fire it. "A defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon." (*People v. Rodriguez, supra,* 20 Cal.4th at p. 13; *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 536, 541-542 [pointing gun at a police officer's head with finger on trigger demonstrated implied assertion the pellet gun was charged]; *People v. Mearse* (1949) 93 Cal.App.2d 834, 836-838 [defendant's command to victim to "halt or 'I'll shoot'" indicated gun was loaded].)

Here, evidence that the gun was loaded was even more compelling than that in *Montgomery*. Appellant went back to his apartment and refused police commands to come outside. Officer Chellew heard footsteps running back and forth in the apartment and appellant eventually admitted that he hid the 12-gauge shotgun in the attic and a 12-gauge shell along with other ammunition in the toilet after the assault. Criminals "do not usually arm themselves with unloaded guns" (*Hall, supra,* 87 Cal.App. at pp. 635-636) and the prosecution can establish whether a gun is loaded through circumstantial evidence. (*People v. Orr* (1974) 43 Cal.App.3d 666, 672.) Through his words and

10

actions, appellant behaved as if the gun was loaded and operable and that he intended to fire it if his demands were not met or his actions were opposed.

We are mindful of our Supreme Court's admonishment in *People v. Rodriguez, supra,* 20 Cal.4th 1, 12 to avoid appellate fact-finding when reviewing a judgment. In *Rodriguez*, the appellate court reversed an assault conviction, holding there was insufficient evidence the gun used by defendant had been loaded or that defendant attempted to use it as a bludgeon. (*Id.* at p. 12.) Our Supreme Court reversed, holding the jury reasonably could have inferred the gun was loaded because evidence showed defendant had threatened the victim, had shot someone else the day before, and logically, as a gang member, would not have carried an unloaded gun in an area of known gang violence. (*Ibid.*) Defendant's own volitional acts, therefore, provided a reasonable basis for the jury's conclusion. (*Id.* at p. 13.) Viewing this record as a whole, it was well within the realm of reasonable inference for the jury to find the shotgun was operable and loaded. Accordingly, we find there was substantial evidence supporting the convictions for assault with a firearm.

We agree with appellant's contention that his testimony that he hid the 12-gauge shell in the toilet after the assault, came after the section 1118.1 motion, and therefore cannot be considered when deciding whether that motion should have been granted. Appellant's own testimony bolstered the prosecution's case but played no role in our decision because "when reviewing the denial of a motion to acquit for insufficient evidence made at the close of the prosecution's case, we consider only the evidence then in the record. [Citations.]" (*People v. Smith* (1998) 64 Cal.App.4th 1458, 1464.) Sufficient evidence was presented during the prosecution's case-in-chief to present the matter to the jury for its determination, the test under a section 1118.1 motion.

## II. No Misstatement of the Law on Present Ability to Commit Assault

### A. *Contention*

Appellant contends the prosecutor committed prejudicial misconduct during closing argument by misstating the law on assault when she told the jury "it could convict appellant of assault merely because he had a 12-gauge shell somewhere in his

11

apartment." Appellant further contends the trial court failed to correct the prosecutor's misstatement.

### B. Background

In her closing argument, the prosecutor argued that the reasonable interpretations of the evidence pointed to appellant's guilt. She argued that "[appellant] had a 12-gauge shotgun shell inside [the] gun" and that appellant unloaded the gun and attempted to get rid of the evidence before the police searched his apartment. The prosecutor then argued: "We don't have to have that gun loaded for [appellant] to be able to have present ability to assault. We can have a totally unloaded gun, and if he has a 12-gauge shotgun shell within reach, whether it was in his room, in the balcony, in his pocket, we are good." The prosecutor explained that the 12-gauge shell was in appellant's possession after the assaults and before the police arrived because appellant admitted he hid it in the toilet. The prosecutor added: "So you do not have to all agree that the shotgun shell, the 12-gauge, was actually in the gun for you to find that he had present ability. You can say yeah, it was in his room before [it] got in the toilet, it was in his pocket, it was in his possession." Defense counsel objected and a sidebar was held. Defense counsel explained that she objected to the prosecutor's misstatement of the law regarding present ability and her statement that not all 12 jurors had to agree. The trial court stated that the jurors must unanimously agree that appellant had the present ability to commit the assault but they did not need to agree under what circumstances he possessed the present ability. Defense counsel agreed that explanation was "fine" but was concerned because the jurors were told they did not all have to agree. The trial court then instructed the jury as follows: "Ladies and gentlemen, I am not really sustaining the objection, but what I am going to tell you is that she said you don't have to agree. You all have to agree that the elements were met, and one of the elements in this case is present ability."

When argument resumed, the prosecutor stated: "That is exactly right. You all have to agree there is present ability, but you don't have to pinpoint as to this being a good present ability versus this being bad. He could have had it in his pocket, that is present ability. He could have had it in his room, it is present ability."

12

## C.    Relevant Law

Counsel has "broad discretion in discussing the legal and factual merits of a case," but "it is improper to misstate the law." (*People v. Bell* (1989) 49 Cal.3d 502, 538, cited in *People v. Mendoza* (2007) 42 Cal.4th 686, 702.)  "The applicable federal and state standards regarding prosecutorial misconduct are well established.  '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.]  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves '"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'  [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

## D.    Analysis

Appellant's argument is without merit because the prosecutor did not misstate the law on present ability.  Contrary to appellant's contention, the prosecutor did not argue that appellant could be convicted if there was a shell "somewhere" in the apartment.  She argued that appellant had the present ability to commit an assault if the shotgun was unloaded but the shotgun shell was "within reach."

In *People v. Simpson, supra,* 134 Cal.App. 646, an additional step required to fire a gun was held not to negate the present ability to injure.  There the appellate court found (1) that a rifle with 10 loaded cartridges in the magazine but an empty firing chamber did constitute a deadly weapon, and (2) that the extra step required of the defendant, to lever a cartridge into the firing chamber, did not preclude a finding that he had possessed the present ability to injure.  The court reasoned that to determine otherwise would be as unreasonable as asserting "that an assailant has not the present ability to commit a violent injury upon the person of another by means of a sword or dagger because it is necessary to first withdraw the weapon from a scabbard which hangs by his side." (*Id.* at pp. 651-652.)

13

A similar result was reached in *People v. Ranson, supra,* 40 Cal.App.3d 317, where the defendant threatened an officer with a rifle that was loaded and operable but jammed with an angled cartridge. There was evidence from which one could infer the defendant knew how to remove and rapidly reinsert the clip to correct the problem. The court analyzed the phrase "coupled with a present ability" and determined: "Time is a continuum of which 'present' is a part. 'Present' can denote 'immediate' or a point near 'immediate.' The facts in *People v. Simpson, supra,* 134 Cal.App. 646, for example, present a situation where the gun could be fired nearly immediately. We are slightly more removed from 'immediate' in the instant case; however, we hold that the conduct of [the defendant] is near enough to constitute 'present' ability for the purpose of an assault." (*People v. Ranson, supra,* 40 Cal.App.3d at p. 321.)

The Supreme Court approved the *Ranson* analysis in *People v. Chance* (2008) 44 Cal.4th 1164. There the court found the defendant had the present ability to commit assault even though there was no round in the firing chamber, because he could have chambered one simply by pulling back a slide. (*Id.* at p. 1173.)

Appellant argues that present ability requires "a loaded gun and only one very minor step to be completed before that gun can be fired." He suggests that the tasks required to make the gun operable here–retrieving the 12-gauge shell from his room, ejecting the unusable shells and reloading, were considerably more than the examples provided in the case law, and were beyond appellant's abilities. We do not speculate how many steps were necessary to make the gun operable or appellant's level of expertise with firearms. The prosecution presented evidence here from which the trier of fact could infer that appellant loaded the shotgun with the 12-gauge shotgun shell. Appellant left the balcony and went into his apartment. He retrieved the shotgun, returned to the balcony and pointed the shotgun at the victims. Appellant testified that he placed the 12-gauge shotgun shell in the toilet *after* the assaults. Appellant did not remove the 16-gauge shotgun shells from the shotgun or attempt to hide them. Whether appellant had the present ability to commit the assaults is a question of fact for the jury which the prosecution may prove "by circumstantial evidence." (*People v. Orr, supra,* 43

14

Cal.App.3d at p. 672.)  Under the reasoning of *Simpson* and *Ranson*, we view appellant's conduct in loading the 12-gauge shell into the shotgun "near enough to constitute 'present' ability for the purpose of an assault." (*People v. Ranson, supra,* at p. 321.)

No prosecutorial misconduct occurred because the prosecutor did not misstate the law, therefore, the trial court had no obligation to instruct the jury.  Nevertheless, in an abundance of caution, the trial court informed the jury that all 12 jurors had to agree that the prosecution proved that appellant had the present ability to commit the assaults.

## III.  Substantial Evidence Supported the Criminal Threat Convictions

### A.  *Contention*

Appellant contends that the evidence was insufficient to support the jury's finding that he made criminal threats as to Jordan and Leonard.  Specifically, he contends (1) section 422 requires a verbal threat, and (2) the actual words must have been a substantial factor in bringing about the victims' sustained fear.  He argues his statements "played at most a trivial role" in making the victims afraid and appellant's "physical acts were the only substantial factors in causing sustained fear."  California's case law does not support appellant's position and we reject the contentions.

### B.  *Standard of Review*

When determining whether the trial evidence was sufficient to sustain a conviction, "our role on appeal is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  We review the entire record in the light most favorable to the judgment to determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  (*Ibid*.)  "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)  So long as the circumstances reasonably justify the trier of fact's finding, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Rodriguez, supra*, 20 Cal.4th at p. 11.)

## C.     Relevant Authority

Section 422 provides in pertinent part:  "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety" is guilty of a crime.

Section 422 was enacted to punish those who try to instill fear in others.  (*People v. Felix* (2001) 92 Cal.App.4th 905, 913.)  It does not punish "mere angry utterances or ranting soliloquies, however violent."  (*People v. Teal* (1998) 61 Cal.App.4th 277, 281 (*Teal*).)  The circumstances under which the threat is made give meaning to the words used, and "threats are judged in their context."  (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137.)

In *People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*), the California Supreme Court explained:  "In order to prove a violation of section 422, the prosecution must establish all of the following:  (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat— which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances.  [Citation.]"

16

### D. Sufficient Evidence Supported Appellant's Conviction

Contrary to appellant's contention that we should analyze what appellant *said* to Jordan and Leonard separately from what he *did* to them, section 422 makes clear that "the communication and the surrounding circumstances are to be considered together . . . . '[I]t is the circumstances under which the threat is made that give meaning to the actual words used . . . .' (*People v. Butler* (2000) 85 Cal.App.4th 745, 753 . . . ; [citation].)" (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 860.) Section 422 may not be violated by nonverbal conduct alone, but a combination of words and gestures may constitute a criminal threat under section 422. (*People v. Franz* (2001) 88 Cal.App.4th 1426, 1442, 1446.) The relevant surrounding circumstances include the defendant's close proximity to the victim, expressed anger, or use of curse words. (See *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1221.)

We reject appellant's request to parse the evidence. The events at appellant's apartment complex unfolded rapidly, and in considering whether appellant issued a criminal threat we must consider the facts as a whole, not as isolated segments. There is no question that appellant's words threatened harm to Jordan and Leonard. He called them "niggers" and told them they needed to get out of his neighborhood. He told them they would not "be around here too much longer" if they did not leave his neighborhood. Appellant followed up these words by pointing a loaded shotgun at Jordan and Leonard and then running down the stairs to confront them and ultimately chasing Leonard down the street. Jordan testified that when she "heard the words uttered by [appellant]" and then saw appellant "reaching for the shotgun" she feared for her life. The day after being threatened, she moved out of the neighborhood and never returned. Leonard also feared for his life and never returned to that neighborhood. He felt he "wasn't safe anymore" because of the color of his skin and "the words [appellant] said to [him]."

Appellant's contention also fails because there is no requirement that appellant's actual words be a "substantial factor" in causing the victim's fear. In this case, the jury properly found that appellant's threats to Jordan and Leonard were made with the requisite intent and was the type of threat that satisfied the provisions of section 422 and

17

reasonably caused Jordan and Leonard to be in sustained fear for their safety. (*Toledo, supra,* 26 Cal.4th at p. 235.)

In a case involving a federal mandatory sentencing provision when a death occurs as a result of a drug overdose, the United States Supreme Court recently ruled that the prosecutor must prove that the illegal drug actually caused the death. (*Burrage v. United States* (2014) 571 U.S. ___ [134 S.Ct. 881, 187 L.Ed.2d 715] (*Burrage*).) Relying on *Burrage*, appellant argues "section 422 be read to require a threat be the "but for" cause of the victim's fear, not just a substantial contributing factor."[6] We find *Burrage* distinguishable.

## IV.     Legal Causation Instruction to the Jury

Appellant next argues that the trial court should have instructed sua sponte that his words had to be a "substantial factor" in bringing about the "sustained fear" that is an element of section 422. The contention lacks merit. There is no requirement that appellant's words be a "substantial factor" in causing the victims' sustained fear (see part III, *infra.*) The trial court has a sua sponte duty to instruct on the general principles of law that are closely and openly connected with the facts and are necessary for the jury's understanding of the case. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) The jury was instructed on the requisite elements of the section 422 offense, including the requirement that "[t]he threatening statement caused the person threatened reasonably to be in sustained fear for his or her own safety." Jordan and Leonard specifically testified that appellant's statements caused them to have that fear. No further instruction was required.

## V.     Admission of Impeachment Evidence Was Harmless Error

### A.     Contention

Appellant contends the trial court erred in allowing appellant to be impeached with his prior juvenile adjudication under section 626.9, subdivision (b), possession of a firearm within 1000 feet of a school, because such crime does not evince a readiness to

---

[6]     Appellant filed a supplemental brief addressing this issue.

do evil and is not a crime of moral turpitude.  He argues the improper impeachment was prejudicial.  The People argue appellant was not impeached with his prior adjudication but was impeached "with the existence of a fact previously denied by him."  They argue the impeachment was expressly authorized under Evidence Code section 780,[7] and for that reason there was no moral turpitude requirement.

### B.      Background

Over defense counsel's objection, the trial court ruled that appellant may be impeached with a juvenile adjudication for violating section 626.9, subdivision (b), possession of a firearm in a school zone.  The trial court limited the prosecutor to impeach appellant only with the conduct and not the actual adjudication.  The following colloquy occurred during cross-examination by the prosecutor as appellant testified on his own behalf:

"[PROSECUTOR]:  Now, what made you think [Leonard] was looking - - he was walking confident?

"[APPELLANT]:  Maybe he did have a gun at the time.

"[PROSECUTOR]:  Is that how you walk when you have a gun on you?

"[APPELLANT]:  No, I don't walk with guns.

"[PROSECUTOR]:  You don't?

"[APPELLANT]:  No.

"[PROSECUTOR]:  Didn't you have a gun at the school grounds?

"[APPELLANT]:  Yes, I did.

### C.      Legal Standards

Evidence of a witness's past criminal conduct can be admitted to demonstrate the witness's lack of veracity, subject to the discretion of a trial court.  (*People v. Wheeler*

---

[7]      Evidence Code section 780 states in relevant part:  "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: . . . (i) The existence or nonexistence of any fact testified to by him."

(1992) 4 Cal.4th 284, 295, superseded by statute on other grounds as stated in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1459.)

A witness may not be impeached with the fact of a prior juvenile adjudication because it is not a "conviction." Evidence of the underlying conduct, however, is admissible, if the conduct involved moral turpitude. (*People v. Lee* (1994) 28 Cal.App.4th 1724, 1740.)

### D. Analysis

Whether appellant's possession of a gun on school grounds constituted a crime of moral turpitude is of no consequence because appellant was not impeached with his prior juvenile adjudication. The record reveals that appellant testified on cross-examination that he did not carry firearms, i.e. "walk with guns." The prosecutor questioned the existence of this fact by asking appellant if he carried a gun on school grounds. Appellant readily admitted that he did and no further questions on the subject were asked. "When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them." (*People v. Cooper* (1991) 53 Cal.3d 771, 822.) Furthermore, the prosecutor made no reference to appellant's prior juvenile adjudication in closing arguments.

In sum, appellant's contention fails because the prosecutor did not impeach appellant with his prior juvenile adjudication.

### VI. No Cumulative Error

Appellant further contends that the errors alleged in his previous arguments cumulatively amounted to reversible error. This contention is without merit because the foregoing discussion demonstrates "there was . . . no error to cumulate" (*People v. Phillips* (2000) 22 Cal.4th 226, 244).

### VII. Imposition of Sentence for Gang and Firearm Enhancements

Relying on *People v. Rodriguez* (2009) 47 Cal.4th 501 (*Rodriguez*), appellant asserts the trial court erred in imposing a five-year term for the street terrorism

enhancement (§ 186.22, subd. (b)(1)(B)), and a consecutive four-year term for personal use of a firearm enhancement (§ 12022.5, subd. (a)), as to count 1. A review of the record demonstrates that the court, as urged by the prosecution in its sentencing memorandum, sentenced appellant to the five-year gang enhancement under section 186.22, subdivision (b)(1)(B), a result not prohibited by *Rodriguez*.[8]

Section 186.22 provides that if a person is convicted of a felony, his or her sentence shall be enhanced (increased) if the jury determines the crime was committed for the benefit of a criminal street gang. The length of the enhancement depends on the felony of which the defendant stands convicted. For most felony convictions, the trial court has discretion to choose from a triad of two, three, or four years. (§ 186.22, subd. (b)(1)(A).) If the felony is a serious felony as defined in section 1192.7, subdivision (c), the term of the enhancement is five years. (§ 186.22, subd. (b)(1)(B).) If the felony is a violent felony as defined in section 667.5, subdivision (c), the term of enhancement is 10 years. (§ 186.22, subd. (b)(1)(C).)

In *Rodriguez*, defendant gang member fired five to six shots at three rival gang members. (*Rodriguez, supra,* 47 Cal.4th at p. 504.) The jury found defendant guilty of three counts of assault with a firearm, and as to each count made findings under two sentencing enhancement statutes: (1) he personally used a firearm under section 12022.5, subdivision (a); and (2) he committed a "violent felony," as defined by section 667.5, subdivision (c), to benefit a criminal street gang under section 186.22, subd. (b)(1)(C). (*Rodriguez, supra,* 47 Cal.4th at p. 505.) For each separate assault count, the trial court imposed enhancements under both sentencing statutes. (*Ibid.*)

The Supreme Court reversed the trial court's sentence on the basis of section 1170.1, subdivision (f), which provides: "When two or more enhancements may be

---

[8] We note the issue of whether a trial court is precluded from imposing both a firearm use enhancement under section 12022.5, subdivision (a), and a gang enhancement under section 186.22, subdivision (b)(1)(B) when the offense is a serious felony, is currently pending before the California Supreme Court (*People v. Le,* S202921, review granted July 25, 2012).

imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. This subdivision shall not limit the imposition of any other enhancements applicable to that offense, including an enhancement for the infliction of great bodily injury." (*Rodriguez, supra,* 47 Cal.4th at p. 508.) The Supreme Court remanded the case to allow the trial court to revisit all of its sentencing choices. (*Rodriguez, supra,* 47 Cal.4th at p. 509.)

In *Rodriguez*, the information alleged and the defendant became eligible for punishment under section 186.22, subd. (b)(1)(C) because his personal use of a firearm classified the underlying felony as a "violent" felony (§ 667.5, subd. (c)(8).) Here, unlike *Rodriguez*, the jury found true the street terrorism allegation as alleged under section 186.22, subd. (b)(1)(B) and appellant's underlying felony was a "serious" felony (§ 1192.7, subd. (c)(31) ["assault with a . . . firearm" among crimes considered a serious felony].) Thus there was no prohibited "dual use" within the meaning of section 1170.1, subdivision (f) as occurred in *Rodriguez*.

Appellant also contends that imposition of both the personal use enhancement and the gang enhancement violates section 654. That statute provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (*Id.*, subd. (a).)

In *People v. Ahmed* (2011) 53 Cal.4th 156, 163-164 (*Ahmed*), the court explained that if the specific statutes fail to supply an answer to whether multiple enhancements may apply, a court should consider section 654. When section 654 is applicable in the context of multiple enhancements, it "bars multiple punishment for the same *aspect* of a criminal act." (*Ahmed, supra,* 53 Cal.4th at p. 164.) Unlike a substantive offense, an

enhancement does not define a criminal act but instead focuses on aspects of that act. (*Ahmed, supra,* 53 Cal.4th at p. 163.) "But enhancement provisions do not define criminal acts; rather, they increase the punishment for those acts. They focus on *aspects* of the criminal act that are not always present and that warrant additional punishment." (*Ibid.*) "Sometimes separate enhancements focus on different aspects of the criminal act." (*Ibid.*)

Here, appellant's personal use of a firearm was an aspect of the assault and appellant's acting for the benefit of, at the direction of, or in association with a gang was a separate aspect of the assault. The personal use of a firearm punishes firearm use whereas the gang enhancement punishes gang-related conduct. The two enhancements concern different aspects of a criminal act. Neither is always present and both warrant additional punishment. Therefore, imposition of both is not barred under section 654.

## VIII. Imposition of Sentence for Gang and Hate Crime Enhancements

Appellant contends the imposition of sentence for "both the gang and hate crime enhancements for each offense violated section 654" because both enhancements "depended on the crimes being bias-motivated."

Section 654 bars multiple punishment for the same aspect of a criminal act. (*Ahmed, supra,* 53 Cal.4th at p. 164, see part VII, *infra.*) Here, appellant's race-related motivation was an aspect of the assault and his acting for the benefit of, at the direction of, or in association with a gang was a separate aspect of the assault. The hate crime allegation punished race-related conduct whereas the gang enhancement punished gang-related conduct. The imposition of both enhancements was not barred by section 654.

## IX. Section 422 Sentencing–Counts 4 and 5

Appellant contends his section 422 sentences should have been stayed pursuant to section 654. We agree.

Section 654 prohibits punishment for two offenses arising from the same act or from a series of acts constituting an indivisible course of conduct. (*People v. Latimer*

23

(1993) 5 Cal.4th 1203, 1207-1208. Thus, if a defendant is convicted of several offenses that were incident to one objective, the defendant may be punished for any one of such offenses, but not more than one. (*People v. Perez* (1979) 23 Cal.3d 545, 551.) Whether a course of conduct is divisible and thus gives rise to more than one act under section 654 depends on the defendant's intent and objective. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19.) If all of a defendant's offenses were incident to one objective, he or she may be punished for any one of the offenses, but not more than one. (*Ibid.*) One relevant consideration in determining whether multiple crimes should be considered severable for section 654 purposes is the "temporal proximity" of the crimes. (*People v. Evers* (1992) 10 Cal.App.4th 588, 603, fn. 10.)

Factually, the record indicates that all of the offenses occurred at the same location, and as part of the same confrontation. The assault and criminal threat charges against appellant were incident to a single objective and were part of an indivisible transaction. Case law establishes that even when two offenses were committed by separate acts, section 654 precludes separate punishment when the sole purpose for committing one offense was to facilitate commission of the other. (See, e.g., *People v. Latimer, supra*, 5 Cal.4th at p. 1216 [objective behind kidnapping was to facilitate rape].)

Here, the assaults and threats took place at the same time and each was a means of committing the other and advanced the same objective, instilling fear in the victims.

## DISPOSITION

The judgment is ordered modified to reflect that the 15-year concurrent sentences for the criminal threat (§ 422) convictions (counts 4 and 5) are stayed pursuant to section 654. As so modified, the judgment is affirmed. The superior court is ordered to send a

24

certified copy of the corrected abstract of judgment to the Department of Corrections & Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *
                              FERNS

We concur:


_____, P. J.
         BOREN


_____, J.
         ASHMANN-GERST

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25